# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
October 21, 2014 Session

## STATE OF TENNESSEE v. MICAH JOHNSON, ALIAS

**Appeal from the Criminal Court for Knox County**
**No. 89210     Mary Beth Leibowitz, Judge**

**No. E2013-02356-CCA-R3-CD - Filed March 2, 2015**

The Defendant, Micah Johnson, alias, was convicted by a Knox County jury of one count of premeditated murder, two counts of felony murder, two counts of especially aggravated kidnapping, and one count of especially aggravated robbery. The trial court merged the murder counts and the kidnapping counts into a single count for each, respectively. The trial court imposed an effective sentence of life imprisonment with the possibility of parole plus fifty years for all of these convictions. In this direct appeal, the Defendant contends that (1) the evidence is insufficient to support his conviction for premeditated murder; (2) the trial court erred by failing to instruct the jury regarding substantial interference as mandated in State v. White, 362 S.W.3d 559 (Tenn. 2012), thus, requiring reversal of his kidnapping convictions; (3) the trial court erred, in violation of Tennessee Rule of Evidence 404(b), by allowing introduction of the Defendant's prison disciplinary records as rebuttal evidence to the neuropsychologist's testimony about the Defendant's psychological test results; (4) the trial court abused its discretion by allowing the State to impeach the forensic psychiatrist defense expert with a twenty-two-year-old academic misdeed; (5) the trial court erred by failing to suppress the video recording of the crime scene and the photographs taken at the crime scene and during the victim's autopsy all gruesomely depicting the victim's body; (6) plain error occurred when the State elicited testimony from its rebuttal mental health expert that, if the Defendant was found not guilty by reason of insanity, he was not committable to a mental health facility in her opinion; and (7) the imposition of consecutive sentencing was improper. Following our review of the record and the applicable authorities, we conclude that the trial court's failing to instruct the jury properly pursuant to White constitutes reversible error. Therefore, the Defendant's two convictions for especially aggravated kidnapping must be reversed and remanded to the trial court for a new trial as to those offenses only. In all other respects, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court**
**Affirmed in Part; Reversed in Part; Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Mark E. Stephens, District Public Defender; John R. Halstead (at trial and on appeal) and Robert C. Edwards (on appeal), Assistant Public Defenders, for the appellant, Micah Johnson, alias.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Senior Counsel; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

This case arises from the brutal beating, slashing, and strangulation of twenty-four-year-old Carrie Daughtery ("the victim"), which occurred during the early morning hours of March 19, 2008, in the front yard of her North Knoxville residence—a residence which she shared with the Defendant's girlfriend, Amanda Corts.[1]  Thereafter, a Knox County grand jury returned a six-count indictment against the Defendant, charging him with one count of first-degree premeditated murder; two counts of first degree felony murder (during the perpetration of a robbery or a kidnapping, alternatively); two counts of especially aggravated kidnapping (resulting in serious bodily injury or being accomplished with a deadly weapon, alternatively); and one count of especially aggravated robbery.  See Tenn. Code Ann. §§ 39-13-202, -305, & -403.  A ten-day trial took place in November 2011.

The evidence presented at trial revealed the following facts.  The Defendant and Ms. Corts met sometime in February or March of 2007, and they began dating in the months that followed.  At that time, the Defendant was twenty years old and was attending the University of Tennessee ("UT"), where he studied aerospace engineering.  The Defendant was described as very bright, and later testing revealed that he had an IQ of 133.  According to Ms. Corts, in September of that year, the Defendant began acting "bizarrely"; he was not eating or sleeping well; and he was saying strange and unusual things.  This odd behavior culminated in an assault on another UT student that same month.  After the assault, the Defendant was expelled from the university and arrested.

---

[1]  At the time of the offense, this witness's last name was Close, but her name had changed by the time of trial.

In the days that followed, the Defendant began complaining of symptoms he believed to be the result of a heart attack, and "it kind of got progressively worse every day[,]" according to Ms. Corts. Ms. Corts then contacted the Defendant's father to come pick him up due to the Defendant's high level of anxiety and paranoia, including his belief that the police were watching him. Ultimately, the Defendant was taken to Baptist Hospital ("Baptist") for mental health treatment, and he remained there for over a week. The couple then separated due to the Defendant's mental health issues.

In October 2007, while the couple was separated, the victim moved in with Ms. Corts at her Columbia Avenue home in North Knoxville. Ms. Corts was open-minded to having a roommate due to the fact that she had broken up with her live-in boyfriend, Mitch Folk, in March 2007 and that he had moved from the residence when the relationship ended. Ms. Corts was asked about whether the victim and her ex-boyfriend had any similar physical characteristics, and Ms. Corts stated that they had "a much different physical presence" because the victim was at least a foot shorter than Ms. Corts's ex-boyfriend and had a much lighter complexion.

The victim and Ms. Corts frequently spoke about the Defendant and his mental health issues. The victim even told Ms. Corts about a family member she had with some psychiatric problems and about her belief that the Defendant exhibited some of the same symptoms. According to Ms. Corts, the Defendant had regained control of his life and was "much more like his normal self" by December 2007, and the victim agreed with Ms. Corts's assessment. Ms. Corts and the Defendant reunited and again began dating, and from that time on, Ms. Corts, the victim, and the Defendant began to spend a lot of time together.

Over the next few months, the Defendant did not exhibit any bizarre behavior, returning to "his old self again[,]" in Ms. Corts's opinion. The Defendant did most of the yard work at the residence for Ms. Corts, like mowing the lawn and raking leaves, because Ms. Corts had fibromyalgia and a type of arthritis known as Reiter's Syndrome and was, therefore, unable to do it on her own. Ms. Corts further stated that the Defendant was actively looking for a job and trying to find another school to go to; she believed he was compliant with taking his mental-health related medications. The Defendant ultimately got a job at Knoxville News Sentinel newspaper as a warehouse worker and lived with his father and step-mother, about a mile away from Ms. Corts's home. However, he began staying over some nights with Ms. Corts. Later, in February 2008, the Defendant got another job at a Coca-Cola warehouse, which was about fifteen minutes away from where Ms. Corts and the victim lived. He worked "second shift," going in sometime around 2:30 or 3:30 p.m. and getting off between 11:30 p.m. and 12:30 a.m. Ms. Corts never noticed any bizarre behavior or sleep disturbances in the Defendant during this time.

The Defendant turned twenty-one on March 6, 2008, and on the weekend just prior to the attack on the victim, Ms. Corts and the Defendant celebrated on a Saturday evening[2] with the victim at Barley's Tap Room ("Barley's"), where the victim worked as a server and a bartendar. According to Ms. Corts, they enjoyed themselves on this evening and nothing unusual happened.

On March 18, 2008, the Defendant woke up at Ms. Corts's home after spending the night there. The victim was also at home that day, sleeping most of the day because she was not feeling well. The three of them spent some time together until the Defendant had to leave to get ready for work at the Coca-Cola warehouse. The victim left later that day, also having to go to work, working the "closing shift."

That evening Ms. Corts took her regular sleeping medication, likely between 11:00 or 11:30 p.m. As Ms. Corts was getting ready for bed, the Defendant called her at approximately 12:00 or 12:30 a.m. The Defendant told her about his day at work and his plans to test-drive a car someone had for sale, so due to the late hour, Ms. Corts made plans with the Defendant for the following day. Later that evening, she heard a noise outside her home that evening, which she believed came from the side of her house, but she was unable to see anything suspicious from the side window of the residence, which faced the carport and driveway. She returned to bed assuming the wind had blown over some trash cans or something of that nature.

Also about 12:30 a.m. on March19, 2008, the victim got off work, making about $80 dollars in tips that evening according to her Barley's boss. Her regular work attire included a Barley's t-shirt and a server apron, if she was serving but not bartending. According to the victim's boss, there would usually be loose money from tips in the victim's apron. Her boss also confirmed that the victim was carrying a pink Motorola Razr cellular telephone that evening.

A 911 call was made on March 19, 2008, at 1:46 a.m. A Columbia Avenue neighbor of Ms. Corts's and the victim's was outside that morning and saw a woman pull up in front of their residence in a "gray white" sport utility vehicle ("SUV"). As the woman exited the vehicle, a man hit her in the head with a rock and dragged her across the yard while continuing to strike the woman in the head. The caller could no longer see either of the individuals by the time she placed the phone call but described that the male was wearing dark clothing. The only other car the neighbor saw at the home belonged to Ms. Corts. The first officer arrived at the victim's and Ms. Corts's residence at 1:57 p.m. and discovered the

---

[2] The calendar reflects this date as March 15, 2008.

victim's bloody body partially lying under the victim's silver Ford Explorer, which was parked on the street in front of the house.

After questioning Ms. Corts, the Defendant was quickly determined to be a suspect in the victim's murder, and officers began looking for his vehicle, a "red early '90s, late '80s, Ford F-150" with a different-colored passenger's side door. Officer Scott Coffey of the Knoxville Police Department ("KPD") went to the Defendant's father's house, who gave him permission to search the residence although the Defendant was not there. The screen to the Defendant's bedroom had been removed, and the blinds had been "partially tore off the window."

After speaking with officers at the police station, Ms. Corts went to stay at her parents' house in Loudon County because she was distraught. Ms. Corts gave her cellular phone to her father, Norman Close, so he could help her deal with any matters that arose and required attention. Later that day, Mr. Close received a call from the Defendant. Mr. Close answered and informed the Defendant that he was answering Ms. Corts's phone. After a brief silence, the Defendant asked to speak with Ms. Corts, but Mr. Close refused this request. Mr. Close asked the Defendant where he was and suggested to him that he turn himself in to the authorities; Mr. Close repeated these statements several times during the approximately five-minute phone call. The Defendant only responded with "little snippets of words that amounted to remorse": for example, "Well, I've screwed up. I've messed up." Although the Defendant was rambling during the conversation, he was not totally incoherent, according to Mr. Close.

When Ms. Corts prepared to return to Knoxville later that day, she went to her car, which was parked in the driveway. She noticed some gravel in the shape of a heart and the words, "I'm dead." According to Ms. Corts, "it was obvious someone had looked through [her] car" and had left an unfinished beer can and cigarette butts inside. The Defendant had been to Ms. Corts's parents' house on several prior occasions.

During the late evening hours of March 19, 2008, Officer Coffey had returned to work and continued to look for the Defendant. Officer Coffey, while stopped at an intersection approximately a mile and a half away from Columbia Avenue, observed a pickup truck matching the description of the Defendant's vehicle. Officer Coffey followed the vehicle and determined that it belonged to the Defendant; he observed a white male as the driver. After another cruiser arrived to assist, the officers activated their blue lights and pursued the pickup truck. A short chase ensued, and although the Defendant ran traffic lights, he was not traveling at a high rate of speed. Once on the Henley Street Bridge, the Defendant "slammed on his brakes[,]" exited the car, ran to the side rail, and jumped up "like he had intended to jump." Another officer "pulled [the Defendant] back as he was attempting to go over," but

Officer Coffey opined that the Defendant had "kind of [started] coming back on his own." The Defendant was thereafter taken into custody.

Immediately following the attack on the victim, officers began to process the crime scene. They found the victim's blood on the driveway and steps in front of the side entrance to the residence, which was near the carport where Ms. Corts's car was parked. Loose coins were also observed on the driveway and steps. There was a blood trail from this area across the yard to the victim's vehicle. Along this trail, and strewn about the yard in front of the hedges, were the victim's purse, a bloody jacket, and a single shoe. A bloody gray t-shirt, a bloody white t-shirt, a set of keys, and the other shoe were found in the grass close to the victim's SUV. Officers also observed a bloody shovel next to the victim's body and two blood-stained pieces of brick in the yard, one lay in the grass towards the front of the vehicle and the other lay next to the victim's body. A rope was tied around the victim's neck.

The victim's blood was found on the right, passenger's side rear tire of the SUV, on the right passenger's side door, and on the passenger's side door frame. The vast majority of the blood was found near the bottom of the vehicle. Blood was also found on the inside of the SUV, again on the passenger's side.

Experts analyzed the blood patterns observed on the scene, concluding that swipe, transfer, and impact stains were present in the driveway and yard, and further, that all of these three, plus a flow pattern, were present on the passenger's side of the vehicle. These patterns were explained for the jury: a transfer is "when blood is moved from an object to another object"; a swipe occurs when something already has blood on it and "another object comes in contact with that transfer and . . . moves the blood again in . . . another direction"; an impact stain is when blood "that's in motion strikes another object"; and a flow pattern is when "there's so much [blood] that gravity takes effect, and it makes [the blood] flow down to the bottom." Timothy Schade, with the KPD Forensic Unit, testified that there were "more impact, kind of medium velocity impact stains" on the passenger's side door frame. Additionally, a bloody fingerprint was lifted from the handle of the right passenger's side door, and later testing identified the fingerprint as the Defendant's and the blood as the victim's.

The Defendant's pickup truck was also processed following his arrest. There was a bag of clothing and other items found in the bed of the pickup truck. Inside this bag was a pair of blue jeans, a green t-shirt, two white socks, a blue washcloth, and a pair of men's white tennis shoes. Many of these items were blood-stained. Officers looked inside the tennis shoes and came across the victim's pink Motorola Razr cellular telephone and blood-stained money in the amount of $87. Loose change was also found in the pocket of the blue jeans. A piece of rope was discovered in "the bend of the front seat of the truck"; however,

this rope was later determined to be of a different type of rope than that used to strangle the victim. Also in the cab of the truck, officers came across an automated teller machine ("ATM") receipt, reflecting that the Defendant had withdrawn $500 in cash on March 19, 2008, at 2:52 a.m. Blood was seen on the steering wheel, the driver's side door, the steering column, the driver's side door handle, and the light switch area. Blood was also observed on the truck's exterior and on the keys to the truck. Much of this blood was determined to be the victim's after subsequent testing.

Dr. Darinka Mileusnic-Polchan, the Chief Medical Examiner for Knox and Anderson counties, conducted the victim's autopsy. According to Dr. Mileusnic-Polchan, the victim suffered two "basal skull fractures" to her head, which required a "tremendous force[.]" The victim also suffered multiple blows and "chopping injuries" mostly to her head and neck. According to Dr. Mileusnic-Polchan, the "overall view" of the victim's body reflected "the combination of blunt trauma with the rectangular object versus chopping injury with the kind of blunt-edge blade." Finally, Dr. Mileusnic-Polchan saw a woven pattern imprinted on the victim's neck from the nylon rope; she was able to determine that this was "one of the last things" that happened to the victim. Dr. Mileusnic-Polchan also observed defensive injuries to "the hands and wrists or forearm[.]" Dr. Mileusnic-Polchan opined that the victim's death was not immediate, taking "several minutes[.]" The victim's "main cause of death was blunt force injuries to the head[,]" with the chopping injuries to the neck and the strangulation being contributing factors. The manner of death was homicide. Dr. Mileusnic-Polchan said her opinion was consistent with the rope, shovel, and pieces of brick found at the crime scene.

It was later determined that the Defendant parked his truck about a block away from the residence before the attack. He also went home and showered immediately following the murder, put his bloody clothes in a bag, and then left for Georgia. However, he later returned to Tennessee. The Defendant's phone records were entered into evidence. Those records indicated that the Defendant placed multiple phone calls while in Atlanta, Georgia on March 19, 2008.

Ms. Corts was asked about the yard work the Defendant did at her residence. She stated that she had a lawnmower and tools at the home, including a rake and a shovel, all of which were kept under the carport in front of where she parked her car. According to Ms. Corts, one would be unable to see any of these items from the road. Ms. Corts described the location of the loose bricks on the property: "There was [sic] bricks . . . that lined from the patio up to the yard. There was a little bit of a terrace. And then the bricks were along the side of the carport closest to the grass[.]" Ms. Corts believed that all of the loose bricks "were in the back"; she also did not recall any of the front porch bricks being loose. She did not remember having any rope at her house.

The Defendant wrote Ms. Corts while he was incarcerated. The letter, in part, stated, "I know you've lost two. But you will learn much and more about than that [sic]. . . . Please acknowledge my life is still worth something."

The Defendant presented many witnesses on his behalf to defend on the ground that he was insane at the time he committed the murder.[3] First, his father, Gary Johnson, testified about the Defendant's deteriorating mental condition. He described the Defendant's childhood and educational experiences—including the Defendant's mother's battle with cancer, and how that affected the Defendant; the Defendant's parents' separation; the Defendant's "sensitive and shy" nature; the Defendant's expulsion from high school due to marijuana and drugs, although he was later readmitted; and the Defendant's good grades and high academic performance until his sophomore year at UT. In the fall of 2006, the Defendant's sophomore year, his grades started to fall, even failing a couple of courses, and he began to "lose a lot of focus, constantly had to be reminded of chores to do, [and] would misplace things[.]" This decline continued in the spring of 2007, according to Mr. Johnson. The Defendant became obsessed with "political things" that were on television, even asking his father if he was president of the United States. The Defendant lost the ability to do simple math calculations and flunked all of his college courses, losing his scholarship. By summer, the Defendant "became more disorganized[,]" constantly forgetting his keys and became unable to do simple chores.

The Defendant again enrolled in classes at UT in the fall of 2007. This was the semester during which the Defendant was arrested for assaulting another UT student. The Defendant told his father that "there was [sic] a group of guys behind him that had been calling him names like 'pretty boy' and 'fag boy' and [a] bunch of derogatory names." During a break in class, the Defendant saw this individual and his friends in the hallway. The Defendant told his father that the individual "clinch[ed] his fist[,]" and the Defendant believed that the student was armed with a knife, so the Defendant hit him. The Defendant then picked up his backpack and fled. When Mr. Johnson bailed the Defendant out of jail, the Defendant "was acting very upset" and "didn't remember hitting the guy." The Defendant was expelled from UT after the assault, and he "became more and more distress[ed] and distraught[,]" according to Mr. Johnson.

The Defendant started to believe there was "a camera in the cable box and he was being recorded." So, according to his father, the Defendant would sit in the hallway around the corner from where the televison was" and would not watch television "directly." On

---

[3] There was voluminous expert mental health testimony presented at trial. Because the Defendant is not challenging the jury's rejection of his insanity defense on appeal, we will only recount the various findings and testimony of the experts and other witnesses relevant to the issues on appeal.

several occasions, Mr. Johnson heard the Defendant's "talking out loud when no one was there" and "peek out of his room through the blinds thinking someone was outside his window or someone was in the next room."

Later, the Defendant's mother called saying that she had met with the Defendant at Ijams Nature Park and "that there was something definitely wrong with him[.]" About an hour after that phone call, the Defendant called his father saying that he had not slept in several days, so Mr. Johnson went to pick him up at Ms. Corts's house. Although the Defendant was in the front yard and should have been able to see his father when he arrived, Mr. Johnson had to honk the car's horn to get the Defendant's attention. Through the night, the Defendant was not making any sense and started hyperventilating, believing he was having a heart attack. The next morning Mr. Johnson took him to Baptist for an evaluation.

When the Defendant arrived at Baptist, he told the nurse he had being doing "all these drugs"; however, Mr. Johnson denied that allegation because he had stayed up with the Defendant all night long and had not witnessed any such behavior. The drug screen came back positive for marijuana and benzodiazepines. The Defendant was described by the emergency room physician as paranoid, agitated, and hallucinating. His ideas were disorganized, being "all over the place[.]" He relayed that he was hearing voices. It was also noted that the examination was limited by "questionabl[e] intoxicat[ion]." The Defendant was transferred to the Baptist psychiatric unit where he was treated by psychiatrist Dr. Sharon R. Burnside. He was admitted with a diagnosis of "psychotic disorder, not otherwise specified." Dr. Burnside started the Defendant on anti-psychotic medications, which were changed in the days that followed as the Defendant continued to exhibit mental health symptoms and Dr. Burnside no longer believed this to be "a drug-induced psychosis." Approximately a week later, the Defendant signed himself out against medical advice. Dr. Burnside's diagnosis of the Defendant at discharge was still psychotic disorder, not otherwise specified, "rule out bipolar mania with psychosis versus first onset of schizophrenia." The Defendant was discharged with instructions to take his prescribed medications and was released to his father's care.

According to Mr. Johnson, the Defendant continued to maintain delusions that he was president, and his thinking "was still very disorganized" after he returned home from Baptist. They sought treatment for the Defendant at several places, eventually utilizing Better Brain Technology to assist the Defendant with his mental health problems. Mr. Johnson described the Defendant as "not himself" in the months that followed, being "very withdrawn" and having "kind of a flat [a]ffect." On one occasion, the Defendant attempted to place a battery in his truck but "crossed the wires," and "the wiring started to burn up"; according to Mr. Johnson, this upset the Defendant because he had done this many times before successfully. Mr. Johnson also believed that the Defendant was still delusional and hearing voices, and he

further suspected that the Defendant was not taking his medication. Mr. Johnson thought the Defendant "was obsessed" with Ms. Corts. In Mr. Johnson's opinion, his son suffered from schizophrenia.

On March 19, 2008, after officers searched Mr. Johnson's home and informed Mr. Johnson about the victim's death, Mr. Johnson attempted to call the Defendant. At first the Defendant did not answer, but eventually, Mr. Johnson was able to speak with the Defendant and urged him to come home because the police were looking for him. Mr. Johnson told one of the detectives about this call, informing the detective that the Defendant told him on this call that "he was going to see the water one last time, . . .[that] he did not know where he was, . . . that he was sorry, and [that] he was insane."

The Defendant's mother, Francis Johnson, also testified about the Defendant's mental state, providing similar testimony as the Defendant's father. Ms. Johnson said the Defendant began smoking marijuana while living in her home, prior to his going to live with his father, and she was aware that the Defendant had used alcohol in the past. She also provided details about her meeting with the Defendant at Ijams Nature Park following the UT assault. She was afraid for the Defendant's safety following this meeting because he was hearing and seeing things. She also said that the Defendant again acted "[i]nappropriate[ly]" around the holidays in 2007.

The parties agreed to stipulate to a journal entry written by the victim. The date of the entry was unknown. The entry reads,

> Dear Amanda,
> In regard to [the Defendant], I don't feel comfortable with him around. My brother Steve is schizophrenic. Sometimes he became convinced we (me, Will, & Pat) are the devil. He especially hated Will. One day mom found Steve sitting on Will's chest. Will was 3 and unconscious.
> I haven't seen him since he put a plastic bag on my head 15 years ago.
> Anyways, [the Defendant] is schizo as well and frankly, he terrifies me.
> Flashbacks - scary - not ready to die.

Dr. Andrew Demick, a clinical psychologist, testified that he was asked to evaluate the Defendant's mental state during the UT assault. The Defendant told Dr. Demick that he punched the other student four or five times in the face, before fleeing the campus. Dr. Demick determined that the other student "had never had any contact with [the Defendant]" and that there was "no indication that [the Defendant] was being verbally abused." In his report, Dr. Demick concluded,

Based upon the results of this evaluation, it is the opinion of this examiner that at the time of the commission of the acts constituting the alleged offense, severe mental disease or defect did prevent [the Defendant] from appreciating the nature or wrongfulness of such acts, pursuant to TCA 39-11-501. There is strong reason to believe that [the Defendant] only engaged in his violent behavior due primarily to psychosis he was experiencing in September of 2007.

Because the Defendant was incarcerated on the murder charges, Dr. Demick did not make any "recommendation as to judicial commitment[.]"

Dr. Demick was later asked to consult on the Defendant's competency to stand trial and mental state on the murder charges. According to Dr. Demick, the Defendant told him that, when the vehicle pulled up in front of the victim's and Ms. Corts's house, "a black and cold feeling of dread" came over him and that he did not believe the person was either Mr. Folk, Ms. Corts's ex-boyfriend, or the victim. He also could not recall why he parked his truck a block away from the home. The Defendant said he left when police arrived on the scene.

Dr. Demick concluded that there was not enough data to support a diagnosis of schizoaffective disorder, which did not mean that the Defendant "was not experiencing some psychotic symptoms." In Dr. Demick's opinion, the Defendant was competent to stand trial. However, Dr. Demick recommended that, "[d]ue to the fact that there appears to be conflictual evidence" about the events surrounding the murder, the Defendant needed to be evaluated in an inpatient facility to determine his mental state at the time he committed the instant offenses.

Dr. Keith Allen Caruso, qualified as an expert in forensic psychiatry, testified that he reviewed many of the discovery materials, including police reports and other information gathered by law enforcement about the murder and the prior UT assault, medical records, school records, and crime scene and autopsy photographs, and ultimately diagnosed the Defendant as suffering from a "schizoaffective disorder, bipolar type." In Dr. Caruso's opinion, the Defendant "was unable to appreciate the nature and wrongfulness of his actions" when he attacked and killed the victim. According to Dr. Caruso, the Defendant committed these offenses during a period of "paranoid psychosis[.]"

In making this diagnosis, Dr. Caruso had obtained from the Defendant several different versions of the events surrounding the murder. In the first version told, the Defendant said that the victim was supposed to repay him money for pot that he had previously paid her for but that she had never purchased. When she partially repaid him on

-11-

that early morning, he propositioned her for sex for the remaining amount still owed.  He stated to Dr. Caruso that he had sexual fantasies about the victim.  According to the Defendant, when she slapped him after he propositioned her, he killed her.  He left when the police arrived.  Furthermore, the Defendant told Dr. Caruso that he took the victim's cellular telephone so she could not call the police because he was unsure if she was dead.  He also said that he parked a block away from the house so Ms. Corts would not see him.  Dr. Caruso did not find this first version truthful, despite the fact that the Defendant gave this version more than once, albeit with some conflicting facts.

In the months that followed, Dr. Caruso was contacted by the defense to interview the Defendant again.  This time the Defendant provided a second story to Dr. Caruso.  The Defendant told Dr. Caruso that he believed that Ms. Corts's ex-boyfriend had been lurking around the house and that he mistook the victim for Mitch Folk.  The Defendant believed that either Mr. Folk would attack his girlfriend again—because Ms. Corts had said that Mr. Folk previously raped her, according to the Defendant[4]—or that they were sneaking around behind the Defendant's back.  He told Dr. Caruso that he parked a block away from the house so that Mr. Folk would not see him.  He again stated that he left when the police arrived.  In this version, he said that he could not remember why he took the cellular telephone, that the money was likely inside the phone, and that he made no attempt to conceal the body.  The Defendant also recounted this version to Dr. Caruso more than once.

In the third version, the Defendant was unsure of who the victim was when he attacked, stating that he just saw a "a scary black figure coming" towards him or, later, that it was just a "shape" coming towards him.  It may have been Mr. Folk, but he was unsure and possibly made that assertion based upon the suggestions he had received from the others.  According to Dr. Caruso, what was present in every version was a "pervasive sense of fear that someone was going to kill him."  Dr. Caruso also thought the Defendant's mental state had deteriorated since their initial encounter.

Neuropsychologist Dr. Daniel Spica administered several psychological tests to the Defendant.  He relayed his findings from those tests to the jury, most importantly that the Defendant was not aggressive or assertive and would likely only be violent during a state of psychosis.

The State then presented several witnesses in rebuttal.  The Defendant's disciplinary records while in prison awaiting trial were entered into evidence and reflected several violations of prison rules.  There was also evidence introduced that the Defendant went to the prison's law library nineteen times during his detention.  The Defendant's bank records

---

[4] During the State's rebuttal proof, Ms. Corts denied that she had ever told the Defendant such.

were also entered into evidence, showing his activity around the time of the murder, including the $500 cash withdrawal.

The Defendant's warehouse supervisor at Coca-Cola testified that the Defendant was a good worker and that he noticed no signs of mental illness in the Defendant. On March 19, 2008, when the Defendant's shift ended early that morning, the Defendant asked if he could test drive another employee's car, but that employee told the Defendant "maybe tomorrow night or the next night[,]" according to the supervisor. He also stated that the Defendant did not appear upset or agitated at that time. Ms. Corts was recalled and reiterated that the Defendant sounded normal when she spoke with him on the morning of March 19, 2008.

The State presented a rebuttal mental health expert, Dr. Rokeya Srutana Farooque, who was also declared an expert in forensic psychiatry. Dr. Farooque testified that she performed a forensic evaluation of the Defendant while he was receiving inpatient care at her facility, Middle Tennessee Mental Health Institute ("MTMHI"), a maximum security psychiatric facility. In Dr. Farooque's opinion, the Defendant was able to appreciate the nature and the wrongfulness of his acts. Dr. Farooque further stated that "[m]ental illness is one part" of the equation in making insanity determinations, it does not by itself make someone unable to appreciate the wrongfulness or nature of their conduct.

The Defendant provided "many different accounts" to Dr. Farooque before telling her that "[h]e didn't know where he was, and he felt like something came after him, and he was just striking back." He did not provide any of the same accounts he gave to Dr. Caruso. The Defendant confirmed for Dr. Farooque that he knew where the bricks and shovel were kept at the residence because he did most of the yardwork. Dr. Farooque did not find "any connection between [the Defendant's] mental illness and the crime." Dr. Farooque further stated that the Defendant had an extensive drug and alcohol history and that drugs and alcohol can mimic this kind of psychotic symptomology.

Based upon the foregoing, the jury found the Defendant guilty as charged and rejected his insanity defense. The three murder convictions were merged into a single count, and the two especially aggravated kidnapping convictions were likewise merged into a single count. The trial court sentenced the Defendant to life with the possibility of parole for the murder convictions and to twenty-five years each for the kidnapping and robbery convictions, which resulted in an effective sentence of life plus fifty years. This appeal followed.

## ANALYSIS

On appeal, the Defendant presents the following issues for our review[5]: (1) whether the evidence is sufficient to support his conviction for premeditated murder; (2) whether the Defendant is entitled to relief from his kidnapping convictions as a result of the holding in State v. White, 362 S.W.3d 559 (Tenn. 2012); (3) whether the trial court erred by allowing the State to introduce evidence of the Defendant's post-incarceration behavior in rebuttal to a Dr. Spica's testimony; (4) whether the trial court properly allowed the State to cross-examine Dr. Caruso about a twenty-two-year-old act of academic dishonesty; (5) whether the trial court erred by admitting photographs of the victim's gruesome injuries, taken both at the scene and during the autopsy, and showing a video of the crime scene as well; (6) whether plain error occurred when the State elicited testimony from Dr. Farooque that, if the Defendant was found not guilty by reason of insanity, he was not committable to mental health facility, in her opinion; and (7) whether the trial court erred in imposing consecutive sentencing. We will address each in turn.

*I. Sufficiency of the Evidence*

First, the Defendant challenges the sufficiency of the evidence supporting his conviction for first degree premeditated murder,[6] arguing that "the evidence was insufficient to show that at the time of the homicide [he] was sufficiently free from excitement and passion as to be capable of premeditation[.]" The State responds that the evidence presented at trial sufficiently established the element of premeditation.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the

---

[5] For the sake of clarity, we have reordered two of the issues as presented by the Defendant in his appellate brief.

[6] He does not challenge any of his remaining convictions on sufficiency of the evidence grounds. Moreover, he does not challenge the jury's rejection of his insanity defense.

-14-

evidence is insufficient to support the jury's verdict." Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of proof is the same, whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

First degree murder, in this instance, is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). A person acts intentionally "when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time.

Tenn. Code Ann. § 39-13-202(d).

The element of premeditation is a factual question to be decided by a jury from all the circumstances surrounding the killing. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although a jury may not engage in speculation, it may infer premeditation from the manner and circumstances of the killing. Bland, 958 S.W.2d at 660. Our supreme court has held that the following circumstances are relevant to a finding of premeditation:

> the use of a deadly weapon upon an unarmed victim; the particular cruelty of a killing; the defendant's threats or declarations of intent to kill; the defendant's procurement of a weapon; any preparations to conceal the crime undertaken before the crime is committed; destruction or secretion of evidence of the killing; and [the] defendant's calmness immediately after [the] killing.

Davidson, 121 S.W.3d at 615; see also Bland, 958 S.W.2d at 660. "These factors, however, are not exhaustive." Davidson, 121 S.W.3d at 615. "Establishment of a motive for the killing is a factor from which the jury may infer premeditation." State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004). Specifically, evidence of repeated blows is a relevant factor in

-15-

determining premeditation, although this evidence alone would not be sufficient to establish premeditation. State v. Adams, 405 S.W.3d 641, 663 (Tenn. 2013) (citing State v. Sims, 45 S.W.3d 1, 8 (Tenn. 2001)). Moreover, methods of killing that require more effort, time, and intimate contact than does simply pulling the trigger of a gun are more consistent with a premeditated killing. Id. (citations omitted). Additional factors cited by this court from which a jury may infer premeditation include lack of provocation by the victim and the defendant's failure to render aid to the victim. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000).

While there is no direct evidence that the Defendant intended to kill the victim when he arrived at the Columbia Avenue residence during the early morning hours of March 19, 2008, circumstantial evidence supports the jury's verdict. Around midnight or 12:30 a.m., the Defendant phoned his girlfriend, Ms. Corts, who routinely took sleeping medication, and told her about his day and his plans to look at a car for sale the following day. Ms. Corts described the Defendant as normal sounding and opined that he did not display any of his prior symptoms of mental illness during this call. The Defendant's supervisor at Coca-Cola also did not observe any odd behavior from the Defendant that morning. Moreover, the Defendant parked roughly a block away from the residence before the killing, indicative of an intent to conceal his presence at the residence.

In the Defendant's first recounts of these events, he stated to Dr. Caruso that he propositioned the victim for sex, and he killed her when she declined his request. This could imply a possible motive to the jury. While the Defendant avers that he did not bring any weapons to the scene, the evidence demonstrated that he procured multiple weapons after arriving there. The shovel came from underneath Ms. Corts's carport, kept in an area in front of her car and not visible from the street. All of the loose bricks were in the backyard of the residence, according to Ms. Corts. The Defendant did Ms. Corts's yard work, and he admitted to Dr. Farooque that he knew where these items were located. Ms. Corts was unaware of any rope at her house, and a piece of rope, although not of the same kind used to strangle the victim, was found in the Defendant's truck, leading to a possible inference that the Defendant brought the rope with him.

The severity and viciousness of the victim's wounds are also information which supported a jury's conclusion of premeditation. The Defendant admits in his appellate brief that he used multiple weapons, a brick, a shovel, and a rope, upon an unarmed victim and that the killing was particularly cruel. The attack was also unprovoked. The victim suffered extensive wounds from all three of weapons, some of which were defensive wounds inflicted while she was trying to protect herself. The medical examiner testified that all three types of injuries contributed to the victim's death.

We acknowledge the cases cited by the Defendant, State v. Quincy L. Henderson, No. 02C01-9706-CR-00227, 1998 WL 242608 (Tenn. Crim. App. May 12, 1998), and State v. Martin Stuart Hammock, Jr., No. M2000-00334-CCA-R3-CD, 2001 WL 1218584 (Tenn. Crim. App. Oct. 12, 2001), that were reversed for insufficient evidence of premeditation, relying on the language of State v. Brown, 836 S.W.2d 530, 542 (Tenn. 1992): "The fact . . . repeated blows (or shots) were inflicted on the victim is not sufficient, by itself, to establish first degree murder. Repeated blows can be delivered in the heat of passion, with no design or reflection." The Defendant argues that the proof in this case showed such a spontaneous act. However, we disagree. The Defendant procured the bricks from the backyard, according to Ms. Corts's testimony. After the Defendant broke the brick by striking the victim with tremendous force in the head, he did not end the assault but procured a second weapon from underneath the carport—the shovel—and proceeded to stab and mutilate the victim with it. He then retrieved yet a third weapon, either brought with him or in the same general location as the brick or the shovel, and attempted to strangle the victim with it. The attack on the victim lasted over ten minutes, and only ended when police arrived. As noted above, methods of killing that require more effort, time, and intimate contact than does simply pulling the trigger of a gun are more consistent with a premeditated killing. Adams, 405 S.W.3d at 663. Moreover, the victim's head and neck were mutilated, indicative of a killing motivated by a desire for some sort of gratification and not a rash or impulsive killing. See Davidson, 121 S.W.3d at 616 (citing Tooley v. State, 448 S.W.2d 683, 687 (1969) (concluding that horrible mutilation of victim was a circumstance from which premeditation could be inferred)). Thus, the multiple wounds, over a sustained period of time, are also evidence of premeditation.

The Defendant dragged the victim's body across the front yard to her vehicle parked on the street. From the serological evidence presented, the jury could logically infer that the Defendant was trying to place the victim inside her car, delaying discovery of her body, but was thwarted in this effort when police arrived. The Defendant rendered no aid to the victim. The Defendant admitted that he took the victim's cell phone to keep her from summoning help. Upon arriving back at his father's home, the Defendant immediately showered, changed clothes, and placed his bloody clothes inside a bag. He then left the house through a window, carrying the bag, and proceeded to get $500 cash from an ATM. He fled to Georgia but later returned to Tennessee. Despite the fact that the Defendant's actions "were rushed and not well thought through," all of these actions indicate an intent to secret evidence and some level of calmness following the killing.

We think that, when taken as a whole, the evidence presented by the State was sufficient to allow the jury to determine that the crime was committed with premeditation. Clearly, they heard this evidence and weighed its value. This court has repeatedly stated that

it is not the function of this court to reweigh or reevaluate these types of determinations made by a jury. The Defendant is entitled to no relief on this issue.

## II. *White Instruction*

Next, the Defendant contends that the trial court committed reversible error by failing to instruct the jury properly on the especially aggravated kidnapping charges in light of State v. White, 362 S.W.3d 559 (Tenn. 2012).[7] The State concedes that the instruction was not given but argues that the trial court's error was harmless.

The Defendant was charged with two counts of especially aggravated kidnapping in this case, which were later merged after verdicts of guilty into one count. As relevant to both counts here, especially aggravated kidnapping is "false imprisonment, as defined in § 39-13-302: (1) Accomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon; . . . or (4) Where the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-305(a). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." Tenn. Code Ann. § 39-13-302(a).

In White, our supreme court modified the applicable analysis in cases that involved dual criminal charges for a restraint-related offense, such as kidnapping or false imprisonment, and some accompanying underlying offense that necessarily also involves restraint as well, such as robbery, assault, rape, or murder. See 362 S.W.3d 559. The court overruled State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991), and its progeny and held that a properly instructed jury was the appropriate body to determine whether a separate restraint-related conviction could stand. White, 362 S.W.3d at 577. The court articulated an instruction on "substantial interference" to "ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. at 578. The instruction promulgated identifies the following relevant factors:

> • the nature and duration of the victim's removal or confinement by the defendant;
> • whether the removal or confinement occurred during the commission of the separate offense;

---

[7] We note that White was decided after the Defendant's trial, but the Defendant later raised the issue in his motion for new trial. His case was in the "'appellate pipeline'" when the supreme court issued its opinion, and thus, White is applicable. See State v. Robert Jason Burdick, No. M2012-01071-CCA-R3-CD, 2013 WL 2642313, at *11-12 (Tenn. Crim. App. June 11, 2013), perm. app. denied (Tenn. Nov. 13, 2013)).

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;
• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;
• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and
• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

Id. at 580-81.

Although the trial court in this case instructed the jury in accordance with the pattern jury instruction in effect at that time, it "did not define the key element—the substantial interference with the victim's liberty—as requiring a finding by the jury that the victim's removal or confinement was not essentially incidental to the accompanying felony offense." White, 362 S.W.3d at 580. Therefore, "the same jury instruction error that attended . . . White's conviction exists here." State v. David Earl Scott, No. E2011-00707-CCA-R3-CD, 2012 WL 5503951, at *13 (Tenn. Crim. App. Nov. 14, 2012). Accordingly, we conclude that the trial court did not instruct the jury properly.

We must now determine the effect of the error. In State v. Cecil, our supreme court elaborated that, when the jury instructions do not follow the strictures of White, the failure to instruct is subject to harmless error analysis. 409 S.W.3d 599, 610 (Tenn. 2013). The proper inquiry is whether the error is harmless beyond a reasonable doubt—that is, "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)). The touchstone of this analysis is determining whether a rational trier of fact could interpret the proof at trial in different ways. Id. If the proof could be interpreted in a manner that would not support the Defendant's kidnapping convictions, then the Defendant is entitled to a new trial on those charges. See id. at 611-12.

At the hearing on the motion for new trial, which was post-White, the trial court acknowledged that "we didn't know [the White instruction was required] at the time [of the Defendant's trial] or we would have instructed on it." Nevertheless, the trial court found that, if the charge was error, it was harmless. Specifically, the court stated as follows:

> And the State argues, as the [c]ourt found in sentencing, that the initial attack took place at . . . the home right at the house, and that [the victim] was

probably unconscious—most surely unconscious when she was dragged some distance or close to unconscious. And that was a separate scene. And then a third scene.

      To accept that this was an incidental issue to the killing I think is not what this [c]ourt believed the jury was doing, and . . . it was the jury's finding that there was basically a dragging to a place and then to . . . the car which was separate from what happened at . . . the house. So if there is error it is the [c]ourt's opinion that it is harmless error.

We respectfully disagree with the trial court.

      In the case herein, the evidence showed that the attack began at the side entrance to the victim's residence. The Defendant then dragged the victim across the yard to her vehicle, which was parked on the street. The Defendant also took the victim's phone in an effort to prevent her from summoning for help. The attack involved three different weapons and continued as the victim was dragged across the yard, culminating once the victim was beside her vehicle. The medical examiner cited all three instrumentalities, the brick, the shovel, and the rope, as contributing to the victim's death. The attack was sustained and aggravated in nature, and the proof supported a possible inference that the Defendant, although unsuccessful, was attempting to place the victim inside her vehicle after moving her to the street. While the proof is sufficient to support the two charges of especially aggravated kidnapping, we recognize that it is also subject to more than one interpretation. Had the jury been properly instructed, it could have concluded that the State failed to show removal or confinement of the victim by the Defendant that interfered with the victim's liberty beyond that necessary for the Defendant to assault, and ultimately kill, the victim. The attack continued throughout the period of confinement. Because we conclude that the error was not harmless beyond a reasonable doubt, the Defendant is entitled to a new trial with regard to the especially aggravated kidnapping convictions with appropriate jury instructions as set out in White.

### III. Prison Disciplinary Records

      The Defendant submits that the trial court violated the ban on character evidence pursuant to Tennessee Rule of Evidence 404(b) by permitting the State to introduce the Defendant's prison disciplinary records as rebuttal evidence to Dr. Spica's testimony about the Defendant's psychological test results. The State responds that the Defendant put his character at issue and, therefore, opened the door to the rebuttal evidence.

      Neuropsychologist Dr. Spica testified, on direct examination by the defense, that he was contacted to "help clarify" the Defendant's mental health diagnosis. In addition to other "standardized, quantified testing[,]" Dr. Spica administered four tests to assess the

Defendant's psychological and mood status: (1) the Minnesota Multiphasic Personality Inventory ("MMPI"); (2) the Personality Assessment Inventory ("PAI"); (3) the Psychopathic Personality Inventory - Revised; and (4) the Novaco Anger Scale and Provocation Inventory. According to Dr. Spica, the MMPI, "the most used test[,]" is "a long set of questions that's been used for many years to help determine a person's psychological status, how well they're functioning emotionally, and if they have symptoms pertaining to psychiatric illness." Dr. Spica stated that the PAI was a "more modern test" and was "a very similar questionnaire of over 500 questions." Both the MMPI and PAI resulted in a "valid profile" for the Defendant.

The PAI scaled the Defendant's profile for assertiveness or aggressiveness. Dr. Spica described this scale: "In a commonsense form, to be assertive is to press upon others your will and — try to assert your position and will. Aggression is where you go beyond assertiveness and — and possibly bully others." According to Dr. Spica, the Defendant scored "extraordinarily low" for assertiveness and an aggressive attitude, including"very low" results for verbal and physical aggression. When asked, based upon those tests results, what type of person was the Defendant, Dr. Spica opined, "Probably a person who would be directed by others, you know, more of a — of a follower. At least open to being directed, and not really pushing his own agenda." When asked if this finding was normal for someone in prison, Dr. Spica replied, "I have found it before in individuals who were — who got into circumstances where they were sort of directed to be the fall guy. Yeah. Including mentally impaired people." He also scored low on the MMPI for aggressiveness, according to Dr. Spica: "His overall style of behavior was only at the tenth percentile for aggressiveness." According to Dr. Spica, "people with psychosis usually become aggressive when they're under attack, when they perceive attack."

Dr. Spica stated that MMPI and PAI also tested for "antisocial personality disorder[,]" which disorder he described as follows: "Well, it's someone who does not adhere to the rules of society and breaks rules of society. There are different . . . It's probably a spectrum of bad individuals, including people who enjoy victimizing other people and . . . are gratified by their ability to force their will on another person." He was "very interested" in this test when someone was incarcerated. Dr. Spica did not find "any support for antisocial [disorder] on those tests" for the Defendant. He did find "one measure" that the Defendant had "broken rules" to be elevated. However, Dr. Spica opined that the elevation was "because [the Defendant] was in jail" and that, "when it was normed properly, [the Defendant] didn't show any significant scores for antisocial personality." The "corrective normative data" analyzed by Dr. Spica came from two sources—the public at large and then persons in correctional facilities.

Dr. Spica also administered the Psychopathic Personality Inventory - Revised, which again "pertains to antisocial personality; antisocial behaviors; someone who breaks rules; feels that they're above the law; feels that they can get away with it 'cause they're smarter than everybody else; is stimulus seeking; loves power." Dr. Spica opined that the Defendant "wasn't significant on any of those measures"; those measures included: "cold-heartedness" "egocentricity," and "fearless dominance." Again, this was an important test to Dr. Spica "in assessing for anyone who's incarcerated."

Dr. Spica testified that the Novaco Anger Scale and Provocation Inventory "pertain to a person's ability to control their angry impulses. So it's not so much this attitude of entitlement and victimizing others, it's just being able to control anger." On this test, the Defendant "had entirely normal scores" and did not exhibit any "indication of anger" or "behavior control problems[,]" according to Dr. Spica. The significance of this finding "suggests that any problems [the Defendant] has had with difficulty controlling his behavior was [sic] due to his psychiatric illness as opposed to some personality style of having a hot temper."

Although Dr. Spica deferred ultimate diagnosis to the forensic psychiatrist, the psychological testing "as a whole" suggested to Dr. Spica a provisional diagnosis of "schizoaffective disorder, bipolar type." Dr. Spica confirmed that this was a "major mental illness."

On cross-examination, Dr. Spica was asked if he was aware that, while the Defendant was incarcerated awaiting trial, the Defendant committed the following prison rule violations: on December 13, 2008, "refused a lawful order from law enforcement"; also on December 13, 2008, "resisted . . . one of the guards" and was in "possession of a weapon"; on July 10, 2009, "refused to lock down"; and on January 6, 2011, "assaulted another inmate[.]" Dr. Spica stated that "[t]hese actions" would be contrary to the psychological tests results previously discussed; however, the Defendant could have been in an "active" psychotic state at those times because "someone with a psychotic disorder will show aberrant behavior." Dr. Spica also said that these were "very significant events considering [the Defendant's] personality type[,]" which added to the "psychiatric diagnosis."

Dr. Caruso also testified about the Defendant's character, basing his conclusions on Dr. Spica's tests results. According to Dr. Caruso, a person of the Defendant's character would be unlikely to engage in "murderous violence" unless suffering from a "paranoid psychosis." Moreover, Dr. Demick opined that "there was strong reason to believe that [the Defendant] only engaged in the violent behavior of September 5, 2007[, the prior UT assault,] due to an ongoing psychotic disorder."

As rebuttal evidence, the State called the keeper of records for the Knox County Detention Facility, Officer Debbie Carter. Officer Carter was asked about the rules and regulations for the jail, to which she replied, "Policy and procedures and posted operational rules which are specified rules within the facility that the inmates are — guidelines that they are to follow while incarcerated there." These rules and regulations applied to all inmates; each inmate was given an inmate handbook of the rules; and there were posted operational rules in "every pod area[,]" according to Officer Carter. Officer Carter then detailed the Defendant's violations while incarcerated: On January 6, 2011, assault of an inmate (major)[8]; on February 25, 2011, possession of non-dangerous contraband (minor); on March 26, 2011, possession, hoarding, or distribution of drugs (major); on July 10, 2009, refusal to lockdown (major); and four (major) violations on December 13, 2008—possession of a weapon, possession of drug paraphernalia, resisting physically, and refusing a lawful order. These were the rule violations for which the Defendant had been found guilty.

The Defendant's disciplinary history was also admitted as an exhibit. In addition to the guilty rule violations, the one-page history listed an additional violation on January 6, 2011, for fighting, but the Defendant was found not guilty of that violation.

On cross-examination, the defense inquired about the details of several of these incidents, noting that the possession of non-dangerous contraband violation involved coffee and that the other violation of possession of a drug involved Metamucil, a medicine for stomach ailments. Officer Carter was asked if she was aware that the assault violation occurred within a few weeks of the Defendant's return from MTMHI, where he had been taken off all of his anti-psychotic medications and those medications had been changed, but she was not aware of such information.

Prior to Officer Carter's testimony and outside the presence of the jury, the State informed the defense that it intended to introduce the Defendant's prison disciplinary records, "not about the details of all the writeups that he's had," only the dates and types of rule violations for which he had been found guilty. The State argued, "[W]e believe that that has been raised in the defense's proof through Dr. Spica and his testing; and his testing results saying that the Defendant is a passive person when in a correctional facility who follows the rules and is subject to being abused." The Defendant objected to the admission of these records:

---

[8] Officer Carter explained that, if the violation is minor, it is within the officer's discretion whether to place the prisoner on disciplinary lockdown for the day or write a violation report, which goes before a disciplinary board, like a major violation does.

First off, it's already been admitted or at least testified to through cross-examination of Dr. Spica without asking us or informing us that the 404(b) [evidence] was coming in. So, you know, partly the damage is already done.

But we think that what she's trying to disprove, Dr. Spica's general findings of general behavior based on the tests with these specific incidents, we don't know how [the Defendant] was acting at that time in terms of his mental state. . . .

. . . .

And all they said they intend to do is introduce the charges themselves. We think that is highly prejudicial, and the probative value of rebutting Dr. Spica when they've already questioned him about that is minimum at best.

. . . .

You know, just to say someone's charged with assault and possession of a weapon, we think that's extremely prejudicial in light of very little probative value.

The prosecutor averred that she was only seeking admission of the charges for which the Defendant had been adjudicated guilty. She continued,

But we believe that . . . the whole . . . reason why Dr. Spica's testimony was relevant is because to further their argument that [the Defendant] is a passive type person, and he's only violent when he is in the throes of his psychosis. And we believe that this evidence . . . rebuts that testimony. . . .

You know, my questions to Dr. Spica, he said he was not aware of this. So it's not any proof that was introduced in the record, we just have his answers. But we believe that Dr. Spica's testimony is what opens the door, and . . . we're asking to be able to rebut that.

The trial court ruled that the evidence was admissible, determining as follows:

Dr. Spica testified about the . . . institutional test [he gave] as opposed to the non-institutional test and compared the behavior patterns and testified several times about . . . how it's a little bit different if someone's confined.

. . . I'm worried about introducing records like that because they aren't from a trial with representation or anything else. However, . . . it is a demonstration of patterns of behavior. So I'm going to let the [State] . . . go into that, . . . but not as to the details and not as to any of the rest of it.

The Defendant also raised the issue in his motion for new trial. At the hearing, the trial court concluded that "the disciplinary charges of [the Defendant] . . . came after the facts of this

case, and they go to [the Defendant's] ability to understand afterward." The trial court further determined that, if there was any error in admission of the prison disciplinary records, it was harmless.

It was the Defendant who called Dr. Spica to give expert psychological testimony about the Defendant's character trait for nonviolence based upon his administration of several psychological tests and sought Drs. Spica's and Caruso's opinion that the Defendant was only violent during a period of psychosis. The Defendant did so in an effort to establish his affirmative defense of insanity, i.e., to provide the jury with an inference that he committed the killing during a period of psychosis and was, therefore, not guilty by reason of mental defect or disease. Tennessee Code Annotated section 39-11-501 sets forth the defense of insanity:

> (a) It is an affirmative defense to prosecution that, at the time of the commission of the acts constituting the offense, the defendant, as a result of a severe mental disease or defect, was unable to appreciate the nature or wrongfulness of the defendant's acts. Mental disease or defect does not otherwise constitute a defense. The defendant has the burden of proving the defense of insanity by clear and convincing evidence.
> (b) As used in this section, mental disease or defect does not include any abnormality manifested only by repeated criminal or otherwise antisocial conduct.
> (c) No expert witness may testify as to whether the defendant was or was not insane as set forth in section (a). Such ultimate issue is a matter for the trier of fact alone.

While the State "is required to prove all essential elements of a crime beyond a reasonable doubt, sanity is not an element of a crime." State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999). Section 39-11-501 "places the burden of establishing this affirmative defense squarely on the defendant." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002). To that end, our supreme court has "explicitly reject[ed] the notion that the State must rebut defense proof of insanity with substantial evidence." Id. The State may counter the defendant's proof "by contrary expert testimony, lay witnesses, or vigorous cross-examination designed to undermine the credibility of the defense expert []." Id.

Psychological opinions based upon personal examination and an analysis of accepted psychological tests may be admitted as character evidence tending to show that an individual was or was not likely to have committed a particular act or, in this case, committed the act during a period of psychosis. This testimony proffered by the defense was relevant character evidence of the type sanctioned under Tennessee Rule of Evidence 404 and 405. See State

v. Edward H. Jones, No. 03C01-9301-CR-00024, 1994 WL 529397, at *14-15 (Tenn. Crim. App. Sept. 15, 1994) (finding clinical psychologist's testimony offered to show that defendant had not demonstrated characteristics attributable to child sexual abusers when administered well-accepted, standardized tests designed to measure psychological profiles to be admissible character evidence) (citing State v. Holcomb, 643 S.W.2d 336, 339-341 (Tenn. Crim. App. 1982)).

Thus, it is clear that the Defendant "opened the door" to proof of his character when he presented evidence that he was not assertive or aggressive and only likely to be violent during a period of psychosis in support of his insanity defense. However, the trial court's reasoning at trial for admitting the Defendant's disciplinary records as showing "patterns of behavior" is precisely the danger Rule 404(b) is designed to prevent. The question becomes by what evidence and in what manner could the prosecution rebut the same. The State responds that the trial court did not abuse its discretion by allowing the State to present this evidence in rebuttal.

Any competent evidence which explains or directly applies to evidence introduced by the accused is admissible in rebuttal. State v. Thompson, 43 S.W.3d 516, 524 (Tenn. Crim. App. 2000). "The [S]tate is given the right of rebuttal because it 'does not and cannot know what evidence the defense will use until it is presented at trial.'" Id. (quoting State v. Cyrus Deville Wilson, No. 01C01-9408-CR-00266, 1995 WL 676398, at *9 (Tenn. Crim. App. Nov. 15, 1995)). The admission of rebuttal evidence, as well as the scope of such evidence, is within the sound discretion of the trial judge. State v. Reid, 213 S.W.3d 792, 831 (Tenn. 2006). However, just because evidence may be classified as "rebuttal" does not give either party carte blanche permission to introduce said evidence in violation of the Tennessee Rules of Evidence. Rebuttal evidence must still be relevant and otherwise admissible. Therefore, a discussion of the pertinent rules of evidence dealing with character evidence, Rules 404 and 405, is in order.

Tennessee Rule of Evidence 404(b) provides that evidence of other crimes, wrongs, or bad acts is not admissible to prove the character of a person to show action in conformity with that character. Such evidence may be admissible, however, for "other purposes." The term "other purposes" in Rule 404(b) has been defined to include motive, intent, guilty knowledge, identity of the defendant, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. See State v. Berry, 141 S.W.3d 549, 582 (Tenn. 2004). Such evidence is admissible for other purposes, provided that the trial court: (1) upon request, holds a hearing outside the jury's presence; (2) determines that a material issue exists other than conduct conforming with a character trait and, upon request, states the basis for its determination; (3) finds proof of the other crime, wrong, or act to be clear and convincing; and (4) determines that the probative value of the evidence is not

outweighed by the danger of unfair prejudice. Tenn. R. Evid. 404(b). The safeguards in Rule 404(b) ensure that defendants are not convicted for charged offenses based on propensity as evidenced by other crimes, wrongs, or acts. State v. James, 81 S.W.3d 751, 758 (Tenn. 2002). The Defendant argues that admission of his prison disciplinary records did precisely that, permitted his convictions for the charged offenses based upon the evidence of other crimes, wrongs, or act.

One exception to this ban on character evidence is provided for in Tennessee Rule of Evidence 404(a)(1), which states that "[e]vidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except . . . [i]n a criminal case, evidence of a pertinent trait of character offered by an accused or by the prosecution to rebut the same . . . . " Furthermore, Tennessee Rule of Evidence 405(a) states that in cases where evidence of character is admissible, proof may be introduced in the form of reputation testimony or testimony in the form of an opinion. Thus, typically, "character or reputation can be proved only by evidence of general reputation in the community and not by specific acts nor from personal knowledge of the witness, and that evidence of good character cannot be rebutted by evidence of specific acts of misconduct or of rumors of same[.]" Crawford v. State, S.W.2d 689, 691-92 (Tenn. 1954).

However, Rule 405(a) states that after applying to the court, inquiry on cross-examination is allowed into relevant specific instances of conduct, assuming that the following conditions are satisfied prior to such cross-examination:

(1) [t]he court upon request must hold a hearing outside the jury's presence, (2) [t]he court must determine that a reasonable factual basis exists for the inquiry, and (3) [t]he court must determine that the probative value of a specific instance of conduct on the character witness's credibility outweighs its prejudicial effect on substantive issues.

Tenn. R. Evid. 405(a). The defense never lodged a contemporaneous objection to the cross-examination of Dr. Spica regarding the prison rule violations and cannot now be heard to complain about that line of questioning. See Tenn. R. App. P. 36(a) (noting that relief on appeal is typically not available when a party is "responsible for an error" or has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error."); Tenn. R. Evid. 103(a)(1) (requiring a timely objection as a prerequisite to a finding of error based on the trial court's admission of evidence); Tenn. R. Evid. 404(b)(1) (stating that the court upon request must hold a hearing outside the presence of the jury to determine whether the evidence of other crimes, wrongs, or acts is admissible); see also State v. Smith, 24 S.W.3d 274, 279-80 (Tenn. 2000) (holding that a failure to object to otherwise inadmissible evidence renders the evidence admissible).

Tennessee Rule of Evidence 405(b) further allows for the introduction of specific instances of conduct to prove character where it is an essential element of a charge, claim, or defense: "In cases in which character or a trait of character of a person is an essential element of a charge, claim, or defense, proof may also be made of specific instances of that person's conduct." "Authorities, however, suggest that a character trait is rarely an essential element." State v. Leon Hurd, No. E1999-01341-CCA-R3-CD, 2001 WL 348871, at *12 (Tenn. Crim. App. Apr. 10, 2001) (citing Neil P. Cohen et al., Tennessee Law of Evidence, § 4.05[5] (4th ed. 2000)). "A defamation suit or a suit based on negligent entrustment are primary examples of cases where character is an essential element. In a criminal case, an instance of specific conduct might be admissible where entrapment is the defense." Id. (internal citations omitted). Insanity or other medically diagnosed ailments are not generally thought of as character traits. See Charles A. Wright and Kenneth W. Graham Jr., Federal Practice and Procedure, § 5233. In our view, the Defendant's character was not an essential element of either the charges against him or his defense thereto.

Additionally, Rule 405 does not affect methods of proving "other crimes, wrongs, or acts" under Rule 404(b). See Hurd, 2001 WL 348871, at *12. Consequently, the State should have been precluded from introducing evidence of the Defendant's specific acts while incarcerated unless it was admissible for purposes other than character pursuant to Rule 404(b).

First, we agree with the Defendant that the trial court did not properly follow the procedure in Rule 404(b) before determining that the character evidence was admissible. Therefore, because the strict requirements of the rule were not substantially observed, we give the trial court's decision to admit the evidence no deference. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The testimony of the Defendant's character came from the Defendant's expert clinical psychologist who formed his opinions of the Defendant based upon the administration of well-accepted, standardized tests designed to measure psychological profiles. It did not come in typical fashion from a lay witness with personal knowledge of the Defendant's character. Dr. Spica testified that violence, aggression, and rule-breaking were inconsistent with the Defendant's character. According to Dr. Spica, he was unaware of the Defendant's prison violations, but when asked about the particular violations, he opined that they were "very significant events considering [the Defendant's] personality type." He further stated that learning of such violations could have affected his assessment of the Defendant. Dr. Spica explained that "[t]hese actions" would be contrary to the psychological tests results previously discussed; however, the Defendant could have been in an "active" psychotic state at those times because "someone with a psychotic disorder will show aberrant behavior." Both Drs. Spica and Caruso opined that the Defendant would only likely demonstrate such

rule-breaking and violent behavior during a psychotic episode. Dr. Demick's testimony, that the prior UT assault was likely "due to an ongoing psychotic disorder[,]" supported these opinions. On cross-examination of the State's witnesses, the Defendant was able to inquire into the details of several of the violations to show just that—that he was in an active state of psychosis at the time of the events. He was also able to establish that the possession rule violations were for Metamucil and coffee.

We conclude that evidence of the Defendant's jail disciplinary records was relevant and admissible in this case because it provided the State the opportunity to show that the expert opinion on which the defense theory was based may have been formulated without complete information. See, e.g., State v. Lessley, 26 P.3d 620, 629 (Kan. 2001) (concluding that evidence of defendant's workplace incidents was admissible by state to show that the expert opinion on which the defense theory was based may have been formulated without complete information); State v. Patton, 593 S.W.2d 913, 917 (Tenn. 1979) (holding that defendant's testimony during direct examination that he had normal marital difficulties in his relationship with victim and psychiatrist's testimony that defendant's amnesia as to killing was due to his inability to remember things foreign to his nature, placed defendant's reputation for peace and tranquility in issue, and opened way for state to show, by examination of defendant and other witnesses as to prior bad acts or specific instances of misconduct, that normal marital difficulties included violence by defendant toward his wife and that violence was not foreign to defendant's nature). The trial court vaguely hinted at this reason for admission at the motion for new trial hearing.

Moreover, evidence that the prison rule violations occurred was clear and convincing. It was also for the jury to determine what weight to give the evidence. Dr. Spica testified that, if the Defendant was in an active state of psychosis at the time of these rule violations, such would have added to the Defendant's diagnosis of a psychiatric illness. We conclude that the probative value of this evidence controverting the psychological testing outweighed the danger of unfair prejudice.[9] For these reasons, we conclude that the evidence was properly admitted.

### IV. Academic Misconduct by Defense Expert

The Defendant contends that the trial court abused its discretion by allowing the State to impeach Dr. Caruso with a twenty-two-year-old academic misdeed. The State responds

---

[9] As stated above, the Defendant's one-page prison history listed an additional violation on January 6, 2011, for fighting, but the Defendant was found not guilty on that charge. This exhibit should have been redacted to remove reference to this charge. However, any admission of this additional violation was harmless given that the jury already had before it eight guilty rule violations.

that the trial court properly allowed cross-examination of Dr. Caruso about an act of academic dishonesty while in medical school.

Dr. Caruso, based upon his credentials, was admitted as a defense expert in the field of forensic psychiatry and gave his conclusions on the Defendant's mental state, that being the Defendant "was unable to appreciate the nature and wrongfulness of his actions" when he attacked and killed the victim.

The State then engaged in a lengthy and thorough cross-examination of Dr. Caruso. During cross-examination, the prosecutor approached the bench and said that a jury-out hearing may be necessary in order to determine if Dr. Caruso engaged in "scientific misconduct[.]" The trial court excused the jury, and the following events took place.

The prosecutor conducted a voir dire examination of Dr. Caruso concerning the alleged misconduct while in medical school. Dr. Caruso admitted that he "altered some data on a med student research project over 20 years ago" in December of 1988. He further explained, "And because I hadn't published anything and hadn't turned it in for credit, it was viewed as a minor offense and I was on academic probation for a year, graduated the following year, and it's not been an impediment to my career subsequently." Dr. Caruso agreed that this was during the time period covered by his resume or curriculum vitae ("CV"), which was submitted to the jury as an exhibit. When asked by defense counsel if this incident had affected his career in any way, Dr. Caruso replied that it had not, noting the many achievements of his career which followed.

Defense counsel objected to admission of this line of questioning, arguing, "[T]his was 20-some years ago. Since then he's been able to [succeed] in his profession, doing well, with the knowledge of this out there. So we don't think it's relevant. We think it's highly prejudicial, particularly because of its age." The prosecutor responded,

> First of all, we think it's relevant because he has talked about his educational background; his CV was introduced which covers this exact same time period. He talked about him being in school; he talked about his research, . . . him publishing stuff. So we think it is relevant.
> We think that it is also admissible under 608 as impeachment since it goes to, we believe credibility.

The trial court then commented and ruled as follows, "Which isn't time barred. Well, I'll let you ask and I'll let the doctor answer exactly what he just answered, if he . . . can repeat it, because I think that will take care of the matter."

The jury was returned to the courtroom, and cross-examination of Dr. Caruso continued. Dr. Caruso was asked, "[W]hile you were at Cornell did you manipulate data by selective use, alteration, and fabrication[.]" He replied, "I altered some data on a med student research project about 22 years ago. Yes. It was a stupid thing to do." Dr. Caruso further explained to the jury on redirect examination that he had "never published any of the data" and that the incident had not caused him any problems in his career. The State asked of its rebuttal mental health expert, Dr. Farooque, if she had ever engaged in this type of behavior, and she said that she had never altered or fabricated data "in [her] life."

An expert must be qualified by specialized knowledge, skill, experience, training or education in the field of expertise. McDaniel v. CSX Transp., Inc., 955 S.W.2d 257, 264 (Tenn. 1997). Evidence that bears on the expert's professional expertise, such as the person's education, training, licensing, and experience, is admissible. See Sneed v. Stovall, 22 S.W.3d 277, 280-82 (Tenn. Ct. App. 1999). Evidence that an expert falsified data on a research project while in medical school is also logically relevant. Such evidence tends to test the qualifications and credibility of the expert before the trier of fact. See Tenn. R. Evid. 401 ("'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

However, the trial court's ruling implies that, because the academic misconduct was relevant to attack Dr. Caruso's credentials, the conduct is not governed by Tennessee Rule of Evidence 608(b). We disagree with the trial court. It is precisely because this academic act of dishonesty pertains to Dr. Caruso's credibility as a witness that Rule 608(b) governs. See Sneed, 22 S.W.3d at 281.

This court reviews a trial court's ruling pursuant to Rule 608(b) under an abuse of discretion standard. See State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002). However, a trial court's decision is not entitled to deference by this court when it fails to substantially comply with the procedural requirements outlined Rule 608(b). See generally State v. Lankford, 298 S.W.3d 176, 182 (Tenn. Crim. App. 2008) ("Just as in Rule 404(b), we now conclude that if a trial court fails to comply with the procedural requirements of Rule 609,[10] then the court's decision to admit or exclude a prior conviction is not entitled to deference by the reviewing court."). The trial court found Rule 608(b) to be inapplicable to this twenty-two-year-old academic misdeed, thus, making none of the findings set forth in the rule. Accordingly, that decision is not entitled to a deferential standard of review, and we must independently determine the admissibility of the impeachment evidence. See id.

---

[10] The same standard that applies Rule 609 also logically applies to Rule 608(b).

Tennessee Rule of Evidence 608(b) provides,

> Specific instances of conduct of a witness for the purpose of attacking or supporting the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness . . . , be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness . . . .

Before a witness can be questioned, the trial court, upon request, must hold a hearing to determine whether "the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry." Tenn. R. Evid. 608(b)(1). The rule further provides, as relevant here,

> The conduct must have occurred no more than ten years before commencement of the action or prosecution, but evidence of a specific instance of conduct not qualifying under paragraph (2) is admissible if the proponent gives to the adverse party sufficient advance notice of intent to use such evidence to provide the adverse party with a fair opportunity to contest the use of such evidence and the court determines in the interests of justice that the probative value of that evidence, supported by specific facts and circumstances, substantially outweighs it prejudicial effect . . . .

Tenn. R. Evid. 608(b)(2).

Here, the prosecutor informed the trial court that a jury-out hearing was likely necessary to determine the admissibility of Dr. Caruso's twenty-two-year-old act of academic misconduct. The trial court did excuse the jury and allowed both sides to question Dr. Caruso. Dr. Caruso admitted to the wrongdoing and that he was he placed on academic probation for one year by the Office of Research Integrity. The act described, falsifying research results on a medical school project, was an overt act of dishonesty directly related to making medical findings. Dr. Caruso's role as a witness was to opine that the Defendant could not appreciate the nature or wrongfulness of his acts; this was a central issue in this case. The State's expert said that she had never engaged in similar behavior. Not only does the academic misconduct call Dr. Caruso's qualifications into question, it also sheds an unfavorable light upon his propensity for truthfulness. This matter is not trivial, especially when experts often disagree on the insanity defense. See, e.g., In re Vioxx Liability Litigation, 489 F. Supp. 2d 587, 594-95 (E.D. La.) (holding that expert's misrepresentation about certification status was admissible, "especially in litigation where experts often disagree on critical issues").

-32-

Usually, as occurred in this case, there will be "countervailing proof" of the insanity defense put before the jury, and "the jury must give the testimony of every witness who testifies the weight, faith, and credit that the testimony deserves." Sneed, 22 S.W.3d at 281-82. The jury was to determine whether Dr. Caruso's testimony concerning the mental state of the Defendant was truthful, and in giving weight to Dr. Caruso's testimony, the jury had the benefit of evidence concerning Dr. Caruso's veracity and character. We conclude that the probative value of this twenty-two-year-old academic misdeed substantially outweighed its unfair prejudicial effect upon the jury, and inquiry into such conduct was proper cross-examination under Rule 608(b). See, e.g., id. (determining as proper impeachment evidence under Rule 608(b) where expert "was bound by the ethical rules of his profession, and yet engaged in a practice of deception for a number of years even though he knew that his acts could constitute grounds for revocation of his license"). However, even if the admission was in error, any error was harmless. See generally George L. Blum, J.D., Annotation, Propriety of questioning expert witness regarding specific incidents or allegations of expert's unprofessional conduct or professional negligence, 11 A.L.R.5th 1 (1993) (collecting cases and analyzing those cases in which the courts have considered the propriety of questioning expert witnesses concerning specific incidents or allegations of unprofessional conduct or professional negligence, for the purpose of impeachment). The Defendant is not entitled to relief on this issue.

*V. Photographs and Video Recording*

The Defendant next challenges the admission of certain photographs of the victim's body, taken at both the crime scene and during the autopsy, and the crime scene video recording at trial. He contends that the trial court erred in admitting this evidence depicting the victim's body "where the photos were highly inflammatory and prejudicial and had no probative value." The State responds that the trial court acted within its discretion in admitting the photographs and the crime scene video.

Regarding the crime scene video recording and the crime scene photographs of the victim's body, the Defendant is not specific on appeal regarding his argument for exclusion of these pieces of evidence. He notes that the State introduced "at least six photographs" of the victim's "bloody body" at the crime scene and also introduced the crime scene video "with the same imagery." Although not entirely clear from his brief, a logical inference from these statements is that only one or the other should have been admitted.

The Defendant also challenges introduction of the autopsy photographs, objecting to seven photographs of the victim's injuries that were admitted during the medical examiner's testimony, citing their "very gruesome" nature. He specifically refers to two autopsy

photographs, exhibits 145 and 146,[11] as the "most offensively showing the chopping injuries" to the victim's "face and neck." Photograph 145 is an "overall view" of the right side of the victim's head, and Photograph 146 is a "closeup of [the] largest" chopping injury. He notes that the medical examiner "was able to clearly describe the chopping injuries, including the length of the injuries and irregular edges." The Defendant states that "[t]he trial court acknowledged that the photos were graphic and often showed the same thing as other photos" but still admitted the autopsy photographs. Seemingly, he implies from these statements that the probative value of these exhibits was marginal and that, therefore, their admission was substantially outweighed by the danger of unfair prejudice.

However, there also seems to be a cumulative nature to the Defendant's argument, implying that all of these photographs, both crime scene and autopsy photographs showing the victim's body, and the video recording should have been excluded because they were "gruesome, inflammatory and highly prejudicial." He argues that all of this evidence was not necessary at trial because he was presenting an insanity defense, which was the crucial issue at trial in his opinion, and that "[t]he effect of the photographs was to cause revulsion in the jury and turn their prejudicial sympathies against [him]."

KPD Officer Beth Goodman testified that she photographed the crime scene and that she was present while Officer Dan Crenshaw shot the crime scene video. A jury-out hearing was held prior to admission of the video recording, and Officer Goodman stated that the video recording fairly and accurately depicted the crime scene and that the video was another way of documenting the scene by showing "the live scene as it was at the time." Officer Goodman agreed that certain facts of the scene where only apparent on the video recording and could not be seen from the photographs.

Defense counsel objected to the cumulative nature of admission of both the crime scene video and the crime scene photographs, both depicting images of the victim's bloody body. Defense counsel argued that, because "these are incredibly gruesome photos [and] video[,]" the prosecutor should be required to pick which type of evidence to admit and that only one type of evidence should be allowed, either the photographs or the video but not both. The State responded that the photographs and the video recording were necessary to prove all elements of the crime to the jury beyond a reasonable doubt and were not excessive in nature. The trial court ruled,

As far as the crime scene video, this is the investigation of . . . of Officer Goodman as well as other criminolistics [sic] officers. It is the crime scene video that was taken that night, and I think that it's an appropriate

---

[11] He challenged, however, exhibits 144 and 145 at trial.

testimony for the [j]ury. So far it is not cumulative and overbearing. It's the crime scene. It's the scene. And it may be that we choose to limit things later further down.

. . . .

I . . . may wish to limit something else, but I'm going to allow this [j]ury to see the crime scene video.

Yes, it's . . . certainly prejudicial from the sense that it is a bloody crime scene video. But its probative value, based upon the requirement that she must show what the officers did, and how they went about their investigation, and what they found, and how this young lady was killed, is probative beyond the prejudicial value. It's a murder case.

The jury was returned to the courtroom, and the video was played.

Officer Goodman then described the physical evidence found at the crime scene, and those items were admitted into evidence. The State then initiated a bench conference and indicated its desire to introduce the crime scene photographs. Defense counsel noted that he was objecting the photographs "of the body" and that his objection was due to their prejudicial effect and that they were "just redisplaying what [the State] displayed yesterday in the video[.]" The trial court inquired further, making some indiscernible comments but using the words "to explain." Defense counsel continued,

I mean, we don't need to argue it now, but the photo does less of that than the video did yesterday. So . . . her explanation is necessary because the photo doesn't accurately depict the context like the video did yesterday. So by letting the video in, the photo's absolutely pointless, other than just the shocking effect of the photo.

The trial court ruled to admit the photographs, but again any further comments on this ruling were indiscernible to the court reporter. The crime scene photographs were then introduced into evidence through Officer Goodman's testimony.

Later during the trial, and while the jury was out, the parties discussed admission of the autopsy photographs and which particular photographs the State sought to admit.[12] The State argued that the autopsy photos were necessary to "document different injuries that would assist the medical examiner in explaining to the jury her conclusions. . . . I mean this is a . . . victim who suffered death from three different weapons." Defense counsel then commented on four photographs showing the injuries to the neck, stating that the medical

---

[12] There were a multitude of additional photos that were not introduced at trial.

examiner was capable of explaining the nature of the injuries, the measurements, and the wounds that were inflicted through her testimony and that "[i]t wouldn't be difficult at all to limit the number of those particularly gruesome closeups." The State replied that the four photographs documented the injuries to the neck, particularly that "there are two different types of weapons that were used on her neck." After discussion regarding specific photographs, the State continued, "That goes to 'intentional.' That . . . goes to premeditation, that she suffered two different blows to her face and her throat." The trial court stated, "These are . . . particularly, after 23 years, gruesome photographs. I . . . understand, however, pretty much each one of them and why they're being used, in looking at the different ones, because of the different angles and the need to show certain things." The trial court also commented that "there are repetitive pictures of the same injury from different angles depicting certain things[.]" The trial court then stated it would specifically consider two closeup photographs prior to their admission during the medical examiner's testimony.

Immediately prior to the medical examiner's testimony, further discussion on the two photographs ensued. The trial court excluded one photograph showing a closeup of the victim's neck but allowed the other photograph that depicted "the rope mark" on the victim's neck because it reflected a "different view" where the injury was "more easily seen."

Defense counsel then noted specific objections to exhibits 119, 120, 121, 122, 136, 144, and 145. The trial court then made a "global ruling" on admission of the autopsy photographs, finding "that although they are graphic and . . . often show same things as in other photographs, in these particular photographs there are different angles, and I take it . . . there are different wounds that the doctor apparently wants to show. And I'm going to let them in." The jury returned, and the medical examiner testified that the autopsy photographs would assist her in explaining her findings to the jury. Those photographs were then admitted into evidence during said testimony.

The admissibility of photographs is governed by Tennessee Rules of Evidence 401 and 403. See State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978). Under these rules, the trial court must determine, first, whether the photograph is relevant. Tenn. R. Evid. 401; Banks, 564 S.W.2d at 949. Next, the trial court must determine whether the probative value of the photograph is substantially outweighed by the danger of unfair prejudice. Tenn. R. Evid. 403; Banks, 564 S.W.2d at 950-51. The term "unfair prejudice" has been defined as "[a]n undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Id. Photographs offered by the State must be relevant to prove some part of its case and must not be admitted solely to inflame the jury and prejudice it against the defendant. Id. Whether to admit the photographs rests within the sound discretion of the trial court and will not be reversed absent a clear showing of an abuse of that discretion. Id.

at 949; see also State v. Dickerson, 885 S.W.2d 90, 92 (Tenn. Crim. App. 1993); State v. Allen, 692 S.W.2d 651, 654 (Tenn. Crim. App. 1985).

The same basic tenants applicable to photographs likewise apply to admission of the crime scene video recording. The admissibility of a videotape of a crime scene is within the trial court's sound discretion, and the court's ruling on the admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion. State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993).

As the trial court found, the video corroborated the officers' testimony regarding the layout and investigation of the crime scene and where and how the victim was killed. The portion of the video showing the victim's body, although depicting a bloody crime scene, was not overly inflammatory, and we agree with the trial court that the probative value of the video recording was not substantially outweighed by the danger of unfair prejudice. See, e.g., State v. Henry Lee Jones, No. W2009-01655-CCA-R3-DD, 2013 WL 1697611, at *48 (Tenn. Crim. App. Apr. 18, 2013) (finding that crime scene video corroborated witnesses' testimony regarding the layout of the house and where the victims were killed and that the portion of the video showing the victims' bodies was not overly inflammatory), rev'd on other grounds, State v. Henry Lee Jones, --- S.W.3d ---, No. W2009-01655-SC-DDT-DD, 2014 WL 4748118 (Tenn. Sept. 25, 2014).

Crime scene photographs of a victim tend to be prejudicial by nature, but this fact does not make them excludable per se. Adams, 405 S.W.3d 641, 658 (Tenn. 2013) (citing State v. Jordan, 325 S.W.3d 1, 86 (Tenn. 2010)). Moreover, our supreme court has permitted "photographs of [a victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. (quoting Banks, 564 S.W.2d at 950-51). At trial, the Defendant made no specific objection against any of the crime scene photographs of the victim's body, other than that they were "pointless" and "[did] less of that than the video did yesterday." The State did not introduce an excessive number of photographs of the victim's body at the crime scene; thus, their admission was not multitudinous in nature. The photographs were relevant to the issue of the Defendant's premeditation and intent, and their probative value was not substantially outweighed by their gruesome or horrifying character. See, e.g., State v. Troy Lynn Fox, No. M2013-00579-CCA-R3-CD, 2014 WL 820573, at *12 (Tenn. Crim. App. Feb. 28, 2014) (concluding that crime scene photographs were relevant to the issue of defendant's premeditation and intent and that their probative value outweighed any gruesome or horrifying character).

Autopsy photographs must never be used "solely to inflame the jury and prejudice them against the defendant" and must be relevant to prove some material aspect of the case. Banks, 564 S.W.2d at 951. Again, our supreme court has permitted "photographs of [a

-37-

victim's body] . . . in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Adams, 405 S.W.3d at 658 (quoting Banks, 564 S.W.2d at 950-51). Moreover, this court has held that "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." State v. Derek Williamson, M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing Collins v. State, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)).

The autopsy photographs, including photographs of the "chopping injuries," were highly probative of the nature of the victim's injuries and the location of the wounds. The trial court correctly determined that, while some of the photographs in question were graphic, these photographs were offered to illustrate the medical examiner's testimony regarding the victim's various injuries. See, e.g., State v. Andre Harris, No. W2011-02440-CCA-R3-CD, 2013 WL 2424115, at *10-11 (Tenn. Crim. App. June 5, 2013) (finding no abuse of discretion in the trial court's admission of twenty autopsy photographs); see also Jones, 2013 WL 1697611, at *48 (determining that autopsy photographs of the nature and extent of the victims' injuries were relevant to the issue of premeditation and to illustrate the similarities between those and another murder and furthermore assisted the medical examiner in his testimony regarding the injuries).

The Defendant fails to acknowledge in this section that, in addition to his insanity defense, his premeditation and intent were also central issues at trial, which is in direct contravention to his sufficiency argument on appeal where he argues only about his lack of premeditation. The Defendant claimed that the killing was not planned and was committed during a period of psychosis. The State and the Defendant presented opposing theories regarding the Defendant's alleged mental state, and the photographs and video recording had significant probative value in helping the jury determine what actually happened that day. Moreover, the State was required to prove the element of premeditation. Among the factors probative of premeditation are the particular cruelty of the killing and infliction of multiple wounds. See State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000). While the videotape and the photographs admitted may have included some of the same material, their admission was not error. See State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1993) (concluding no error in admitting a videotape of the crime scene even though it depicted images similar to those of photographs admitted). Each of the different forms of evidence admitted served different purposes and were relevant to the issues to be decided by the jury. See Jones, 2013 WL 1697611, at *48. Accordingly, we conclude that the trial court cannot be said to have abused its discretion by admitting the various pictures of the victim's body and the video recording into evidence.

*VI. Opinion Regarding Defendant's Possible Commitment*

The Defendant argues that the State committed prosecutorial misconduct when it elicited testimony from Dr. Farooque that the Defendant "was not committable to a mental health facility and[,] as the head of the secured forensic facility[,] if [the Defendant] were found not guilty by reason of insanity[,] she would find that he should be immediately released to the community[.]" The Defendant argues that this is a misstatement of the law under Tennessee Code Annotated section 33-7-303 and that, due to the nature of the error, he is entitled to plain error relief. The State responds that the Defendant cannot show plain error in this regard when he "presented evidence on the matter as well" through Dr. Caruso's testimony.

The Defendant acknowledges that he failed to raise any objection to this testimony at trial and only raised this issue for the first time in his motion for new trial. Typically, a party's failure to make a contemporaneous objection to trial testimony will result in a waiver of the issue on appeal. See Tenn. R. Evid. 103(a)(1); State v. Thompson, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000). Thus, the Defendant's issue is only reviewable pursuant the plain error doctrine. See Tenn. R. App. P. 36(b). In order for this court to find plain error in the absence of an objection at trial, we consider the following five factors:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is necessary to do substantial justice.

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). Plain error cannot be found unless the record establishes all of the elements of the Adkisson standard. Id. at 283. In order for this court to reverse the judgment of the trial court, we must conclude that the error involved a substantial right and "more probably than not affected the judgment . . . . " Tenn. R. App. P. 36(b); State v. Yoreck, 133 S.W.3d 606, 611 (Tenn. 2004).

On direct examination of Dr. Caruso, defense counsel asked what Dr. Caruso's recommendation for the Defendant's future was "in terms of psychiatric care and what kind of psychiatric hospitalization" would be needed. Dr. Caruso responded that, if the Defendant was found to be insane, "he should be hospitalized in a forensic psychiatric hospital indefinitely" and was "going to need lifelong medication" to be given by monthly injections. Dr. Caruso continued,

You know, this is a guy who is not real forthcoming about how mentally ill he is. He's going to need to be monitored very, very closely. You know, I think those are the things that, you know, are the best options. . . .

You know, if he winds up in prison he's going to need the same kind of treatment. The access to it is not going to be as good. I kind of worry about medication noncompliance 'cause I've already seen a case where a corrections officer was murdered by . . . an inmate . . . with psychiatric illness that was not on mediation.

The testimony to which the Defendant objects on appeal was sought by the State of Dr. Farooque, their rebuttal mental health expert, who worked as a forensic psychiatrist at MTMHI, a maximum security psychiatric facility. On direct examination, the prosecutor asked Dr. Farooque her opinion about "whether or not [the Defendant] was committable." Dr. Farooque replied that she was not asked by the court to make that determination but that she agreed with Dr. Demick's evaluation where he determined that the Defendant was "competent to stand trial, not committable."[13] After the prosecutor noted Dr. Caruso's opinion that "it would be better for [the Defendant] to go to a secured forensic facility," Dr. Farooquee stated that such a facility was MTMHI, her facility. When asked who would be the doctor to determine whether or not the Defendant was committable, Dr. Farooque replied,

What happens, that when . . . the court declares anybody not guilty by reason of insanity, the person doesn't have anymore charge. So the person is ready to go to the community, go back to the community, have to be released to the community.

So at that point the court should right away call two mental health professionals to do that, to determine the committability. And if they determine that patient is committable, then [the] patient gets into the hospital. If they determine that [the] patient is not committable, then [the] patient gets released into the community.

Dr. Farooque confirmed that her opinion was that the Defendant was not committable.

The Defendant raised this issue for the first time in his motion for new trial. The trial court denied the Defendant's motion for new trial, ruling on this issue as follows:

---

[13] In looking at Dr. Demick's reports, which were admitted into to evidence, we are unable to find any conclusion by Dr. Demick that the Defendant was "not committable." In relation to this victim's murder, Dr. Demick only made a finding the Defendant was competent to stand trial for the offenses. Competency to stand trial and judicial commitment following a not guilty verdict by reason of insanity are not the same.

I am certain that the discussion did affect jurors; however, I think the who[le] trial affected [the] jurors. And the jurors were charged properly to consider the evidence and make its decision, and as far as I know they were not swayed . . . by this issue.

The jury was charged, "A verdict of 'not guilty by reason of insanity' shall result in the automatic detention of the Defendant in a mental hospital or treatment center pending further medical and legal findings." The jurors were also instructed that they were "the exclusive judges of the facts in this case" and were the "exclusive judges of the law under the direction . . . of the [c]ourt."

We begin our analysis by examining the provisions of Tennessee Code Annotated section 33-7-303(a) that were in effect in 2011, the time of the Defendant's trial. In 2011, this section provided as follows:

> (a)(1) When a person charged with a criminal offense is acquitted of the charge on a verdict of not guilty by reason of insanity at the time of the commission of the offense, the criminal court shall immediately order the person to be diagnosed and evaluated on an outpatient basis. The evaluation shall be performed by the community mental health agency or licensed private practitioner designated by the commissioner to serve the court.
> (2) When a person charged with a felony criminal offense under title 39, chapter 13, offenses against person, is acquitted of the charge on a verdict of not guilty by reason of insanity at the time of the commission of the offense and when that person is detained at the time of the acquittal, the court may order that the person remain detained following the verdict of not guilty by reason of insanity, for the purpose of receiving an outpatient evaluation performed by the community mental health agency or licensed private practitioner designated by the commissioner to serve the court. In such cases, the court shall immediately enter an order to detain the person for the purpose of receiving this evaluation and shall order that the evaluation be completed within thirty (30) days of receipt of the court order by the examining professional.

Thus, under this section, the trial court may order a defendant acquitted of an applicable offense by reason of insanity to be detained for diagnosis and evaluation for a maximum of thirty days following receipt of the court order by the examining professional. Tennessee Code Annotated section 33-6-503 (2011) continues by stating that

[n]o defendant may be judicially committed under this part, unless two (2) licensed physicians, or one (1) licensed physician and one (1) licensed psychologist qualified as provided in § 33-6-427(a), file in the commitment proceeding certificates of need for care and treatment certifying that the defendant satisfies the requirements of § 33-6-502(1)-(4) and showing the factual foundation for the conclusions on each item.

After the diagnosis and evaluation period, if certification is made that the person is committable under chapter 6, part 5 of this title, the district attorney general must file a complaint in criminal court seeking judicial commitment. Tenn. Code Ann. § 33-7-303(b)(1) (2011). If there is no certification that the person is committable, the district attorney general must file a complaint seeking only outpatient treatment at a mental health facility. Id. Thus, as is plainly clear from both of the above statutes, applicable at the time of the Defendant's trial in 2011, the maximum period of time such person may be judicially committed is thirty days—absent procedural certification of the acquitted by two licensed physicians who have found that the acquitted falls within the parameters of Tennessee Code Annotated section 33-6-502(1)-(4) (2011). See State v. Janice Floyd, No. W2000-02236-CCA-R3-CD, 2001 WL 846046, at *4 (Tenn. Crim. App. July 20, 2001) (decided under a different version of the statute).

Furthermore, section 33-7-303(e) (2011) requires the jury be instructed "as to the provisions of this section."[14] Here, the trial court charged the jury, although the Defendant's thirty-day detention was not automatic under the 2011 statute, that "[a] verdict of 'not guilty by reason of insanity' shall result in the automatic detention of the Defendant in a mental hospital or treatment center pending further medical and legal findings." This language tracked the pattern jury instruction. See 7 Tenn. Practice, Pattern Jury Instructions–Criminal 40.16(b).

The Defendant argues that the "testimony elicited from Dr. Farooque by the State was an intentional misstatement of the law in an effort to get the jury to believe that if they found [the Defendant] not guilty by reason of insanity, Dr. Farooque would automatically declare him not committable and release him from custody." First, we note that Dr. Farooque did not testify that she would be the mental health professional assigned to determine the Defendant's committablity; she did testify that, in her opinion, the Defendant was not committable. Although Dr. Farooque did state that the Defendant would "have to be released to the community" if found not guilty by reason of insanity, she clarified that this would only occur after two mental health professionals determined that the Defendant was not committable. To give credence to Defendant's argument that Dr. Farooque's testimony

---

[14] The statute was amended in 1977 to add subsection (e).

-42-

implied to the jury that it must not acquit Defendant by reason of insanity, because if Defendant was not committable he would be free to roam the streets and to menace others without restraint, would be to go beyond the actual testimony.

Dr. Farooque did incorrectly state that Dr. Demick had also issued an opinion that the Defendant was not committable to a mental health facility. However, in addition to Dr. Demick's own testimony, his reports were entered into evidence and do not reflect such a finding. The jury was properly charged that they were the exclusive judges of the facts, see 7 Tennessee Practice, Pattern Jury Instructions—Criminal 1.08, and they are presumed to have follow this instruction, see State v. Robinson, 146 S.W.3d 469, 494 (Tenn. 2004).

The Defendant cites to State v. Estes, 655 S.W.2d 179, 184-85 (Tenn. Crim. App. 1983), in support of his argument that Dr. Farooque's comments amount to plain error. In that case, the prosecutor stated during closing argument,

> Now, Miss Speed says he's insane, and that if you find him insane, what's going to happen to him. Well, I'm sure—I guess the Judge will explain that to you, but if you find him insane, they take him and put him in a hospital till a psychiatrist says he's ready to come home, and he goes home.

655 S.W.2d at 184. This court found that to be a clear misstatement of the law in effect at that time:

> T.C.A § 33-709 provides that when one is acquitted by reason of insanity at the time of the commission of the offense, the criminal court shall order the person detained for diagnosis and evaluation for not less than sixty days nor more than ninety days at a hospital or treatment resource.

Accordingly, Estes is not directly on point because Dr. Farooque did not directly misstate the law, and even so, the court in Estes further held that the error was "entirely harmless." Id. at 185; see also State v. David Paul Martin, No. 03C01-9412-CR-00448, 1995 WL 601685, at *9 (Tenn. Crim. App. Oct. 13, 1995) (finding harmless error where the prosecutor made similar statements to those in Estes during closing argument), aff'd on other grounds, State v. Martin, 950S.W.2d 20 (Tenn. 1997).

Next, we note that under section 33-7-303(e) the jury is to be instructed on the possible legal effects of a verdict of not guilty by reason of insanity. The Defendant's jury was instructed that he would be detained pending further medical and legal findings if found to be insane.

Regardless, complete consideration of all five plain error factors is not necessary when it is clear from the record that at least one of the factors cannot be established. Smith, 24 S.W.3d at 283. Therefore, we need not decide today whether a clear and unequivocal rule of law has been breached, i.e., whether testimony on the involuntary commitment process and a medical professional's opinion on a defendant's committability if found not guilty by reason of insanity, some of the further findings required by the statute, are proper testimony before a jury. Compare State v. Christoper M. Flake, No. W2000-01131-CCA-MR3-CD, 2001 WL 792621 (Tenn. Crim. App. July 13, 2001) (holding, in a case where trial court allowed testimony that defendant believed he would be released within sixty to ninety days if found not guilty by reason of insanity, but refused to allow testimony that defendant was "committable" and would not likely be released within such time period, that "[t]he issue of whether the defendant was 'committable' at the conclusion of his trial is irrelevant to his insanity defense, nor is such evidence necessary to correct any incorrect impression left with the jury"), rev'd on other grounds, State v. Flake, 88 S.W.3d 540 (Tenn. 2002), with State v. Voltz, 626 S.W.2d 291, 293 (Tenn. Crim. App. 1981) (although not directly addressing the admissibility of such a statement, noting that a mental health expert gave just such an opinion on committability to the jury), and State v. Michael Jason Vance, No. M2011-02469-CCA-R3-CD, 2013 WL 6001954, at *8 (Tenn. Crim. App. Nov. 12, 2013) (noting that Dr. Farooque also testified before the jury in that case that defendant was not committable for psychiatric treatment), perm. app. denied (Tenn. Apr. 10, 2014).

The Defendant simply states in his brief that "[t]here is no obvious tactical reason for the wavier of this issue[,] and it was not waived for any tactical reasons." However, we agree with the State that the Defendant has failed to demonstrate that his failure to object to Dr. Farooque's testimony regarding the commitment process and her opinion on his committabilty was not a tactical decision. The Defendant elicited similar testimony from Dr. Caruso on direct examination by the defense that the Defendant would spend a great deal of time confined to a psychiatric institution if found not guilty by reason of insanity. Dr. Caruso went so far as to state that, in a similar situation where a psychiatric patient was incarcerated in jail rather than found to be insane and placed in a psychiatric facility, the patient murdered a correctional guard. If the Defendant had objected to Dr. Farooque's testimony, the judge would have likely found that the Defendant had raised the issue through Dr. Caruso's testimony and overruled the objection.

For the same reasons, consideration of the alleged error is not necessary to do substantial justice. Additionally, Dr. Farooque had also opined that the Defendant was able to appreciate the nature and wrongfulness of his acts, thus, inviting the jury to infer that should he be acquitted by reason of insanity, that he may nevertheless may not be committable. The Defendant has failed to establish his entitlement to plain error relief.

*VII. Consecutive Sentencing*

The Defendant argues that the trial court improperly imposed consecutive sentencing based upon its erroneous findings that the Defendant was a dangerous offender and a dangerous mentally abnormal person. The State responds that the trial court acted within its discretion in ordering that the Defendant serve his sentences consecutively.

Our supreme court has recently held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations" "if [the trial court] has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)[.]" State v. Pollard, 432 S.W.3d 851, 859-62 (Tenn. 2013). Thus, the imposition of consecutive sentencing is subject to the general sentencing principles that the overall sentence imposed "should be no greater than that deserved for the offense committed" and that it "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed[.]" Tenn. Code Ann. § 40-35-103(2) & (4). Further, "[s]o long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Pollard, 432 S.W.3d at 862 (citing Tenn. R. Crim. P. 32(c)(1) ("The order [for consecutive sentences] shall specify the reasons for this decision and is reviewable on appeal.")); see also State v. Bise, 380 S.W.3d 682, 705 (Tenn. 2012).

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

(1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
(2) The defendant is an offender whose record of criminal activity is extensive;
(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the

sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

First, we address factor (3) applied by the trial court, that the defendant was a dangerous mentally abnormal person. In applying this factor, the trial court concluded simply, "I think that's pretty clear based upon the previous criminal behavior of [the Defendant] and based upon the testimony at trial." The consecutive sentencing statute mandates that, before a defendant may be found to be "a dangerously mentally abnormal person," a competent psychiatrist must conclude that "the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to the consequences." Tenn. Code Ann. § 40-35-115(b)(3). While such a finding could be inferred in this case based upon the mental health testimony at trial, no psychiatrist made this specific finding, and the State did not put on any proof of this factor or argue for application of this factor at the sentencing hearing. Because there was no such finding made by a competent psychiatrist in this case, this factor may not be applied. See State v. Hallock, 875 S.W.2d 285, 295 (Tenn. Crim. App. 1993).

The trial court also imposed consecutive sentences finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). In State v. Wilkerson, 905 S.W.2d 933 (Tenn. 1995), our supreme court imposed two additional requirements for consecutive sentencing when the "dangerous offender" category is used: the court must find that consecutive sentences are reasonably related to the severity of the offenses committed and are necessary to protect the public from further criminal conduct. Id. at 937-39; see State v. Imfeld, 70 S.W.3d 698,707-08 (Tenn. 2002). The adoption of the abuse of discretion standard with the presumption of reasonableness has not eliminated this requirement. Pollard, 432 S.W.3d at 863.

The State concedes that the trial court failed to make the additional findings required by Wilkerson. When "the trial court fails to provide adequate reasons on the record for imposing consecutive sentences, the appellate court should neither presume that the consecutive sentences are reasonable nor defer to the trial court's exercise of its discretionary authority." Pollard, 432 S.W.3d at 863-64. When "[f]aced with this situation, the appellate court has two options: (1) conduct a de novo review to determine whether there is an

-46-

adequate basis for imposing consecutive sentences; or (2) remand for the trial court to consider the requisite factors in determining whether to impose consecutive sentences." Id. at 864 (citing Bise, 380 S.W.3d at 705 & n.41).

The Pollard court concluded that "because the considerations required under Wilkerson involve a fact-intensive inquiry . . . the better course is to remand to the trial court for consideration of the Wilkerson requirements in determining the propriety of consecutive sentencing." Id. However, we note that the trial judge in this case has since retired and based upon the record before us, we have no hesitance in determining on de novo review that consecutive sentencing was more than appropriate in this case. See State v. Letalvis Darnell Cobbins, No. E2013-00476-CCA-R3-CD, 2014 WL 4536564, at *28 (Tenn. Crim. App. Sept. 12, 2014) (conducting de novo review where record was clear that the Wilkerson factors applied due to level of torture endured by the two victims).

In this case, the victim died from multiple wounds inflicted by three separate instruments, a brick, a shovel, and a rope. The attack on the victim was brutal and somewhat prolonged—she was beat over the head with a brick until it broke; the Defendant chopped at the victim's head and neck with a shovel; and he then tried to strangle her with a rope. The medical examiner cited all three instrumentalities as contributing to the victim's death. We conclude that the sentencing alignment was proper based upon the dangerous offender criterion, i.e., consecutive sentencing was reasonably related to the severity of the killing and was necessary to protect the public from further criminal conduct by the Defendant suffering from mental illness. The Defendant is without relief on this claim of error.

## CONCLUSION

In accordance with the foregoing reasoning and authorities, we conclude that the trial court's failure to instruct the jury pursuant to White constitutes reversible error. Therefore, the Defendant's two convictions for especially aggravated kidnapping must be reversed and remanded to the trial court for a new trial as to those offenses only.[15] In all other respects, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[15] Accordingly, this opinion also vacates the twenty-five-year sentence imposed for the kidnapping convictions, leaving the Defendant presently with a sentence of life plus twenty-five years.